### LYON v. BAILEY et al. (two cases).

(Supreme Court, Trial Term, Putnam County. August 5, 1911.)

1. MORTGAGES (§ 319\*)—SATISFACTION—EXECUTION—MENTAL INCAPACITY.

Evidence *held* to show that a satisfaction of a mortgage was executed by the holder of the mortgage while mentally incompetent to transact any business.

[Ed. Note.—For other cases, see Mortgages, Cent. Dig. §§ 855–863; Dec. Dig. § 319.\*]

2. MORTGAGES (§ 319\*)—SATISFACTION—EXECUTION—FRAUD AND UNDUE INFLUENCE.

Evidence *held* to show that a satisfaction of a mortgage was procured by fraud and undue influence.

[Ed. Note.—For other cases, see Mortgages, Cent. Dig. §§ 855–863; Dec. Dig. § 319.\*]

3. DEEDS (§ 196\*)—VALIDITY—CONFIDENTIAL RELATIONS—BURDEN OF PROOF.

A woman, having no husband or issue, conveyed all her real estate to the children of a sister with whom she resided. She was then about 74 years old and seriously ill, and died about two weeks later. *Held*, that the confidential relations between the parties and the other members of the household cast on the grantees the burden of affirmatively showing that no deception was practiced, and that the execution of the deed was voluntary.

[Ed. Note.—For other cases, see Deeds, Cent. Dig. §§ 587–593; Dec. Dig. § 196.\*]

4. DEEDS (§ 196\*)—VALIDITY—BURDEN OF PROOF—EVIDENCE.

In a suit to set aside a deed on the ground of mental incapacity, undue influence, and fraud, evidence *held* not to overcome the presumption of the invalidity of the deed arising from the confidential relations between the parties.

[Ed. Note.—For other cases, see Deeds, Cent. Dig. §§ 587–593; Dec. Dig. § 196.\*]

Actions by James W. Lyon against Halcyon G. Bailey and others, and by James W Lyon, as administrator of Lavina M. Hooper, deceased, against Tamer L. Bailey and others. Judgments for plaintiff in each case.

Hinman, Howard & Kattell and Marcy & Boynton, for plaintiff. C. H. & J. A. Young, for defendants.

TOMPKINS, J Lavina M. Hooper died March 1, 1907, about 10:30 p. m. at the age of 74 years, leaving her surviving no child or grandchild, and no husband, and the following heirs at law and next of kin only: James W. Lyon and George A. Lyon, brothers, Tamer L. Bailey, a sister, Sheldon A. Givens, a son of a deceased sister, Walter Lyon, Alfred Lyon, and John A. Lyon, children of a deceased

---

\*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

brother, Ida Buckingham, a daughter of a deceased sister, and Evelyn Clark and Minnie Robins, daughters of a deceased brother, all of whom are parties to the first above-entitled action.

For many years prior to April, 1904, Mrs. Hooper had lived in Brewster, Putnam county, N. Y., where her husband had died in about the year ———. Becoming ill in 1904, she was taken to the home of her sister, Tamer L. Bailey in Danbury, Conn., and lived there with the Bailey family until her death. By stipulation these two actions were tried together, and the evidence given is to be applied to both so far as the same is competent and material.

The first action is by James W. Lyon, a brother of the deceased, to set aside an alleged deed from Lavina M. Hooper to her sister, Tamer L. Bailey, and apparently executed on the 15th day of February, 1907, but claimed by the plaintiff to have been actually signed February 16, 1907, purporting to convey all of Mrs. Hooper's real property consisting of four houses and lots in the village of Brewster, N. Y., of the value of about $20,000, and which deed was not recorded until three days after the death of Mrs. Hooper. The other suit is brought by James W. Lyon, as administrator of the goods, etc., of Lavina M. Hooper, against Tamer L. Bailey and others, to set aside an alleged release and satisfaction of a mortage upon real property of the said Tamer L. Bailey, which mortgage was to secure payment of the sum of $2,000, and was held by the decedent by assignment from her late husband, and which release and satisfaction (two papers) are dated, respectively, February 26 and March 1, 1904, and the plaintiff asks for the foreclosure of the said mortgage.

The substance of the claims made by the plaintiffs in both actions is that the alleged deed, release, and satisfaction were procured by undue influence, fraud, and deceit, and at a time when the decedent was physically and mentally incapable of transacting business, and in pursuance of a conspiracy on the part of the members of the Bailey family to procure from Mrs. Hooper substantially all of her property. And in support of that charge the complaint in the administrator's action alleges several transfers of moneys and bank accounts to members of the Bailey family by the decedent, during the month of February, 1907, and it appears from the undisputed evidence that, during a period of 20 days preceding Mrs. Hooper's death, papers were executed, or purport to have been executed, by which real and personal property amounting to about $25,000 in value, and comprising all of her property, except about $300 worth of her personal effects, was transferred to members of the Bailey family.

I have given very careful consideration to the testimony and exhibits of the parties, and the very able and thorough briefs of counsel and the authorities cited by them, and have reached the conclusion that the plaintiffs in both actions should prevail, and the following are my reasons as briefly stated as seems to me they can be, in view of the number of questions involved, and the amount of testimony taken in court and in the form of depositions.

I shall first consider the facts relating to the alleged release and satisfaction of mortgage, because there are some circumstances con-

nected therewith that seem to me to throw some light on the prior preparation and execution of the deed.

The release was executed at 11:30 o'clock p. m. on February 26, 1907, about 70 hours before Mrs. Hooper's death, and the nurse, Susan Woodin, who was present and signed the paper as a witness, described the execution thereof as follows:

"Mr. Bailey came in and asked Mrs. Hooper if she wanted to sign the paper to put the people out of her house in Brewster, and she told him, 'Yes.' * * * He took this paper and held the light. * * * He put the pen in Mrs. Hooper's hand. He took her hand with this pen in her hand. He wrote her name on this paper. * * * That was all he said to her. I didn't know what this paper was; nobody read it. * * * I understood they wanted papers signed to put the people out of the house. * * * He (Halcyon G. Bailey) said that he had been put in to attend to the old lady's property or business, and showed me writing that he had there, and he said that there was something in there to sign, and gave me to understand that it was that business at Brewster, and I said, if there was anything to be done, it would have to be done very soon, because I knew the old lady was nearly gone. He got her all ready to sign the paper, when he asked her the question."

And on cross-examination this witness testified:

"I wouldn't have signed the papers if I had known what they were. Q. Why? A. Because I supposed it was simply what Mr. Bailey said. Q. You think she was competent to sign some paper to turn them out of the house, and not competent to sign these? A. I think this is a different thing altogether. Q. You think she was competent to sign that paper? A. No, I don't think she was competent to sign anything. Q. Why do you think the old lady was competent to sign that kind of a paper, and not competent to sign another kind? The Court: She means to justify them in putting somebody out of the house? Witness: Yes, that is what I mean. I didn't know it affected any property."

This witness seemed to be entirely disinterested, and impressed me as honest and truthful, and seemed to be the only real disinterested witness who described the occurrences at the time and the manner of the execution of this release. This witness also testified that, after Mrs. Hooper's death, Halcyon G. Bailey came to see her, and they talked about the occurrences in Mrs. Hooper's sick room on the night of February 26, 1907, and that she "said to Mr. Halcyon G. Bailey that he told Mrs. Hooper, when he put the papers there to be signed, that he asked her if she wanted to sign the paper to put the family out of the house, and he said 'Did I say that?' and I says, 'You know you did.' Q. What reply did he make to that? A. Not any." And it is a significant fact that, although Halcyon G. Bailey was in court when this testimony was given, he did not take the witness stand to deny or explain it.

At the time of the execution of this release, Mrs. Hooper was very sick, bedridden, and physically heldless, and, besides, her mental condition was such that she was not able to comprehend or transact matters of business, and was easily susceptible to any influence that members of the Bailey family, with whom she was living, might exercise over her. At the same time that the release of mortgage was executed, a bill of sale to Tamer L. Bailey of all the household goods and personal property owned by her, and contained in her house at Brewster,

was executed by Mrs. Hooper, the signing of which·occurred ·at the same time and in the same manner as the execution of the release of mortgage.

On the night Mrs. Hooper died, Halcyon G. Bailey held her hand and helped her to write her name upon a satisfaction piece of the same mortgage, made by Tamer L. Bailey, that was attempted to be released by the paper executed on February 26th, and regarding that transaction Mrs. Woodin testified:

"I don't believe there was anything said, not to Mrs. Hooper. By the Court: Q. Or by her? A. No. By Mr. Hinman: Q. Did you hear Mr. Murphy ask Mrs. Hooper anything? A. He asked her if she acknowledged the paper. Q. What did she say? A. She didn't say anything at that time. Q. Not a word? A. Not a word. Q. There was no word said ·by her during any of that occurrence? A. Nothing at all. By the Court: Did she move her head in any way? A. Not at all. Q. State the condition of Mrs. Hooper at the time this paper, Exhibit F, was signed; describe her condition. A. She was dying. Q. At that time? A. At that time. I observed she was dying. Q. When did she die? A. About an hour or two afterwards."

On that same night after the satisfaction piece was signed, Mr. Murphy who prepared and superintended the execution of the paper, told Mrs. Woodin, in substance, that Mrs. Hooper was in such a condition that she did not know anything that was being done, but that he was willing to stretch a point, to which Mrs. Woodin replied that she was not, and would not. This testimony of Mrs. Woodin was denied by Murphy; but, as I have already observed, I regarded Mrs. Woodin as a truthful witness, and was not so favorably impressed by the manner and speech of Mr. Murphy.

· After Mrs. Hooper's death, the Baileys procured the appointment of one Reed as administrator of the goods, etc., of Mrs.· Hooper, in the state of Connecticut, and thereafter got him to execute another satisfaction piece of this same bond and mortgage, stating to him, in substance, that the mortgage had been paid. It is conceded, however, that no money was paid to Mrs. Hooper, at the time of the execution of either the release or satisfaction piece, and the only claim made by the Baileys as to its payment is that Mrs. Hooper, while living with them, boarded out the amount of $2,000 that was due thereon, although no. account is made of the interest that accrued upon this mortgage during that time, or of the rents received from Mrs. Hooper's real estate in Brewster, amounting after the payment of taxes, etc., and after allowing for the amounts of money deposited to her credit in the savings bank during that period, to about $1,000.

It appears that the satisfaction piece which Mrs. Woodin testified was executed on March 1st, the day of Mrs. Hooper's death, was procured to be executed by her, because the county clerk of Putnam county had refused to record the release executed February 26th, and the said satisfaction piece subsequently executed by Reed, the administrator, was procured because the satisfaction piece purporting to have been signed by Mrs. Hooper on the night of her death was not acknowledged by her, and never completed for record.

The testimony of Mrs. Woodin to the effect that Halcyon G. Bailey stated to Mrs. Hooper, at the time of the execution of the release on February 26th, that the paper which she then signed was to put "the

people out of the house," is corroborated to some extent by the undisputed facts that one of Mrs. Hooper's tenants, a Mrs. Murtha, was in arrears for rent, and that Mrs. Hooper had previously expressed her desire to dispossess her, and the plaintiff's charge that undue influence and deceit were exercised and practiced upon the old lady that night, is somewhat supported by the fact that one Ida Buckingham, who was visiting the Bailey family at that time, was taken out of the house that evening by May Bailey, and, as soon as they returned, she was persuaded to retire to her room and did not see Murphy, or see or hear anything in connection with the execution of the said release.

[1, 2] After a careful consideration of all the testimony and the briefs of counsel, I have reached the conclusion that at the time of the execution of the release and the satisfaction piece on February 26th, and March 1st, the decedent was mentally incapable of transacting any business, and did not know the nature of the papers to which her signature was attached, and did not voluntarily execute the same or either of them, and that Halcyon G. Bailey procured them to be signed by her by means of undue influence, deceit, and fraud.

The deed in question was executed on the 16th of February, 1907, and by it Mrs. Hooper conveyed to her niece and nephew, Halcyon and May Bailey, members of the household in which she lived at the time of its execution, and in which she died on March 1st, following, all of her real estate of the value of about $20,000. At that time the decedent was sick and confined to her room, and was visited daily by her physician, Dr. Sunderland. The doctor says that for three or four weeks before her death she was confined to her bed, and that he visited her about every day from December, 1906, down to the time of her death.

Dr. Sunderland was a witness for the defendants, and on his direct examination testified that up to February 17th she seemed to be normal mentally, and that he first noticed mental aberration on the 17th day of February, when, as he expressed it, "her mind wandered," and the doctor had no distinct recollection of her mental condition on the 14th, 15th, or 16th days of February, and did not recall anything that she said, but did remember that she was confined to her bed. On February 17th the doctor made a record in a memoranda book, to the effect that she was irrational, but was unable to remember who was at the house on the day before.

"Q. I don't suppose you are able to state with any definiteness or assurance, from personal knowledge, just what this woman's mental condition was on February 16, 1907? A. No, sir. Q. If she did sign papers on the 16th of February, 1907, when you were not present, you would not be able to tell what her mental condition was at that time? A. No, all that I know was the 17th. Q. Have you any present recollection of her ability to transact business, or competency to execute papers at any time during her sickness? A. Not that I remember now."

So that the effect of Dr. Sunderland's testimony is to prove the fact that, the day after the deed was executed, Mrs. Hooper was irrational and incompetent to transact business, while he has no distinct recollection of her mental condition the day before.

The testimony of Mrs. Westcott, who attended the decedent on February 17th and 18th, and of Mrs. Woodin, who described her condition from and after February 19th, to the date of her death, convinces me that Mrs. Hooper did not on February 16th have sufficient mind, memory, and understanding to intelligently dispose of her property. At all events, she was in such a physical and mental condition on that day as to be easily susceptible to undue and improper influences by the members of the Bailey household.

Grace Hoyt, who was present at the execution of the deed and signed it as a subscribing witness, and who seemed to be entirely disinterested, testified that she went to the house at the request of Jordon Bailey, and that she reached the house ahead of Lawyer Ives, and, after his arrival, immediately followed him into Mrs. Hooper's room. She testified that the decedent did not speak, except to say "Good morning, and that she was not very well," and that neither Ives nor Bailey told Mrs. Hooper what the paper was that was executed, or what its contents were.

[3] It seems to me that these facts to which I have called attention in connection with the execution of the deed, and the intimate and confidential relations existing between the deceased and the grantees named in the deed, and the other members of the Bailey household, create a presumption against the validity of the deed, and place upon the defendants the burden of affirmatively establishing that no deception was practiced, and that the execution of the deed by Mrs. Hooper was voluntary and understood by her. In other words, their relations were such, and her physical and mental condition was such, that the grantees named in the deed must clearly show that there was no fraud or undue influence, and that the execution of the paper was Mrs. Hooper's free and unrestrained act.

[4] In my opinion the defendants have failed to overcome the inferences that it seems to me must be drawn from the facts established, concerning the decedent's physical and mental condition, and the manner of the execution of the deed, and the circumstances connected therewith, and have failed to show that the transaction was in all respects fair and honest, and free from improper influences, and that the execution of the deed was Mrs. Hooper's free and voluntary act.

The lawyer who drew and directed the execution of the deed, Mr. Ives, testified somewhat in detail to the preparation and execution of the paper, and said, in effect, that Festus Bailey, who had previously spoken to him about the disposition of Mrs. Hooper's property, called at his office and said that Mrs. Hooper wanted to see him, and that on the 13th day of February he went to the house and found her sitting in a chair in her bedroom, on which occasion she told him in substance that she wanted to give her Brewster property to May and Hal Bailey, both of whom were present in the room; May Bailey at the time stroking or smoothing her hair. She had some talk with Halcyon Bailey about a leaking roof, and about his going to Brewster and having the roof repaired, and about some tenant that had not paid his rent. She said something to Ives to the effect that she did not want to make a will, whereupon he suggested that she could accomplish her purpose by executing a deed, and that she said that that was what she wanted.

He prepared the deed, and took it to the house on the 15th of February, but for some reason could not see Mrs. Hooper. He went again the next day about 11 o'clock, having left the deed there the day before. On the day of the execution of the deed, he says that he explained to her fully just what the deed was, at which time Halcyon G. Bailey was in the room, and that, after he had explained its contents, Miss Hoyt came into the room, and then Mrs. Hooper signed the deed. He does not think her hand was guided, but that her arm was steadied by Halcyon G. Bailey, who was standing by her side. He had no recollection of taking her acknowledgment or of asking her if it was her free act and deed. This lawyer was paid for his services by some member of the Bailey family for whom he had previously done law business, and did not know Mrs. Hooper until February 13th. Halcyon G. Bailey took to him a deed from which he copied the description. Ives could not give Mrs. Hooper's language when she gave him to understand that she wanted May and Hal Bailey to have her Brewster property, nor could he tell who first spoke about the subject. He had no talk with her at any time except when Halcyon Bailey or May Bailey was present.

I was not convinced at the trial by the testimony of this witness that Mrs. Hooper fully comprehended the nature of her act, or understood that she was making an absolute conveyance of this property to her nephew and niece. Even at that time, according to the testimony of Ives, she was concerned about the rent that was owing to her by some tenant of the Brewster property, and later, and at the time of the execution of the release of the mortgage, Halcyon G. Bailey, according to the testimony of Mrs. Woodin (to which I give full credence), told Mrs. Hooper that the paper she was to sign was to dispossess her defaulting tenant, and afterward, when Mrs. Woodin charged Halcyon Bailey with having made that statement, he practically admitted it, and, although he had an opportunity to go upon the witness stand and deny having made such a statement to Mrs. Woodin, he failed to do so, and the fact that he spoke to Mrs. Hooper on the 26th day of February about her Brewster property and induced her to execute a paper, which she understood to be in a proceeding to oust a tenant for the nonpayment of rent, is a pretty strong circumstance against the defendants and in support of the plaintiff's claim that Mrs. Hooper did not know at that time that she had deeded away all her interest in the said Brewster property. If, on the 16th day of February, 1907, Mrs. Hooper understood anything concerning the execution of the paper prepared by Mr. Ives, it was that it had to do with Halcyon G. Bailey's management of her Brewster property.

This view of the matter is supported by the testimony of Halcyon G. Bailey himself, taken by commission, respecting a conversation between himself and Mr. Boynton, representing the plaintiff, after Mrs. Hooper's death. The following is his testimony:

"Q. Mr. Boynton inquired about the property your aunt had, and what had been done with it? A. I believe so. Q. Did you tell him that the deed which your aunt had signed had been signed by her so that you could manage the property for her, or that in substance? A. Not in substance. Q. Then you didn't tell him that in word or substance? A. Yes, sir; I told him more."

And Mrs. Woodin testified, concerning a conversation with Halcyon G. Bailey:

"He said that he had been put in to attend to the old lady's property or business, and showed me a writing that he had there, and said there was something in there to sign, and gave me to understand that it was that business at Brewster, and I said, if there was anything to be done, it would have to be done very soon, because I knew the old lady was nearly gone."

The bill of sale, which was executed on the 26th day of February, described the personal property thereby transferred as "contained in my house at Brewster." Besides, testimony was given by two or more witnesses, in no way related to any of the parties, to the effect that, seven or eight months before the execution of the deed, Mrs. Hooper, while visiting in Brewster, stated that she was staying there with them to board out the interest due on the mortgage, and that the Baileys would not get her property, although they were always trying to get it, at which time Mrs. Hooper was having work done on one of her Brewster houses, and stated that it was to "beautify her home, to live there and die there."

One of these witnesses testified that Mrs. Hooper "spoke about some diamonds that she owned, and said that May Bailey wanted to borrow them once, and she had hard work to get them back, and that she wanted to borrow them again to take to New York to get them cleaned. She said they might be replaced with glass, and she would not know the difference." May Bailey admitted that she had borrowed Mrs. Hooper's diamond to wear to New York on one occasion. There is other testimony on the plaintiff's part concerning statements made by Mrs. Hooper regarding the Baileys inconsistent with the making of the deed, and the execution of the other papers. While, on the other hand, there is testimony by witnesses on the part of the defendants, to the effect that, while living at the Bailey home, Mrs. Hooper said that she was being well cared for, and that the Baileys would be well paid for their kindness and care. No member of the Bailey family took the witness stand at the trial. Their testimony was all taken by commission although they were in court during the trial and might have been called as witnesses to deny or explain the testimony of some of the witnesses regarding their alleged conduct and statements. So that I did not have the benefit of observing them as witnesses or hearing their testimony.

At the time of the execution of these papers, Halcyon G. Bailey lived with his wife and family in New York City, and about the 10th or 11th of February, 1907, he went to the home of his parents at Danbury, Conn., where Mrs. Hooper was living, and on the day of his arrival there, or the next day, he drew an order on the Danbury Savings Bank which was signed by Mrs. Hooper, by which she transferred her entire account, amounting to $1,423.26, to her sister, Tamer L. Bailey, and on the same day another order was drawn by May Bailey and signed by Mrs. Hooper, by which her entire savings account in the Yonkers Savings Bank, amounting to $1,243.30, was transferred to the said Tamer L. Bailey. Halcyon G. Bailey, it appears, remained at his parents' house until after the papers were all executed and until Mrs. Hooper's death. His testimony respecting

the preparation and execution of these papers, and the consideration alleged to have been paid to Mrs. Hooper, and the disposition of the deed after its execution, is quite contradictory, and not at all satisfactory or convincing.

Taken altogether, the evidence establishes to my satisfaction a common design on the part of the members of the Bailey family to strip Mrs. Hooper of all her property at a time when she was physically and mentally incapable of understanding their purpose, or resisting their design, and during the last few days of her life while she was helpless, and irrational as well, they procured from her the transfer of practically all of her real and personal property. One fact appears to me to be very significant, and that is that the signatures "Lavina M. Hooper" to all of the papers in question, although made at different times and at different stages of the old lady's illness, are almost identical in character and appearance, and indicates to me that some hand other than Mrs. Hooper's guided the pen with which the writing was done. For instance, the signature on the satisfaction piece, which was written the night the old lady died, and only two or three hours before her death, and while she was in a dying condition, and so far gone that she was not able to acknowledge the execution of the paper, for which reason it was never signed by the notary public, is almost identical with that to the deed which was executed on the 16th day of February. It does not seem to me possible that Mrs. Hooper could have been able on that night of her death to have written her signature as freely and accurately as the one that appears upon the satisfaction piece. True, there is an individuality to these different signatures that would impress one at first with their genuineness, but that may be accounted for by the fact testified to by Mrs. Woodin that at different times she saw Halcyon G. Bailey writing at a desk in his mother's room, on which occasion she observed different sheets of paper with the name "Lavina M. Hooper" written upon them a great many times, and the plaintiff's claim is that at these times Halcyon G. Bailey was writing an imitation of Mrs. Hooper's signature, and practicing with it for the purpose of the execution of these papers, and Mrs. Woodin testified that, at the execution of the papers when she was present, Halcyon G. Bailey held Mrs. Hooper's hand and guided the pen, and here is another matter that Halcyon G. Bailey, although in court, failed to deny or explain. He neglected to take the witness stand and testify concerning the alleged writing by him of Mrs. Hooper's name upon the loose sheets of paper, as testified to by Mrs. Woodin.

The defendants argue that it is improbable that Mrs. Hooper would have died intestate and without disposing of her property, and leaving it be shared by relatives with whom she was not on intimate friendly terms. While no last will and testament has been found as far as this record shows, testimony was given by Dr. Hoag, a brother-in-law of the decedent and an apparently reputable witness, that some months before Mrs. Hooper's death he saw a large envelope among her papers with the word "Will" written upon it, and it is conceded that subsequent to her death Halcyon G. Bailey took possession of all of her papers, among which was this envelope. Dr. Hoag's testimony

in that respect stands unimpeached, and Halcyon G. Bailey failed to deny that he had received into his possession or had seen such a paper.

My conclusions are that the release and satisfaction piece are void, and should be set aside, and that the bond and mortgage should be adjudged valid and existing obligations, and an incumbrance upon the premises described in the complaint, and that the plaintiff have judgment for the foreclosure and sale of said premises, and that a referee be appointed to compute the amount due thereon, and that the said deed to Halcyon G. Bailey and May Bailey is void, and that it be canceled of record, and that the said defendants account for the rents and income of said property, and that a reference be ordered to take and state such account, with costs to the plaintiff in both actions.